Hillegass Estate.

Argued January 11, 1968. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*C. William Freed, Jr.*, for appellant.

*H. Ober Hess*, with him *Harry L. Lees, Jr., Edward J. Hardiman, Matthew M. Strickler*, and *Ballard, Spahr, Andrews & Ingersoll*, for appellees.

Opinion by Mr. Chief Justice Bell, August 6, 1968:

This is an appeal by Esther V. Hillegass, decedent's widow, from the Decree of the Orphans' Court which granted a petition to strike off Esther's election to take against her husband's will.

LeRoy A. Hillegass died August 12, 1965, at the age of 76, leaving an estate inventoried at $265,876. He was survived by his widow Esther V. Hillegass, who was 60 years old and whom he had married five months before his death. David Hillegass, decedent's son by a former marriage, and Bradford LeRoy Hillegass, a grandson, and Alda M. Holtzman, a sister, also survived Hillegass.

LeRoy A. Hillegass and Esther Cassel, a widow, were married on April 2, 1965. Hillegass left a will dated March 19, 1964, and a codicil dated April 15, 1965. In his will, which was executed over a year before his marriage to Esther, he bequeathed a legacy to his son and to his sister conditioned upon their surviving him, then made a number of small charitable bequests, then created a trust of $40,000 for the benefit of his grandson, and then gave his residuary estate in trust to pay the net income to his son for life with the remainder to certain charities. Hillegass, *on April 15, 1965, thirteen days after his marriage to Esther, executed a codicil giving Esther $15,000 and his residence* in Bucks County, together with all of the tangible personal property contained therein, if she survived him. This property and the furniture were appraised at approximately $15,000, so that the codicil gave Esther approximately $30,000.

LeRoy A. Hillegass and Esther V. Cassel, his intended wife, entered into an Antenuptial Agreement, under seal, which raises the most important question in this case. It recites:

"Whereas, it is the purpose of this agreement to give each of the parties hereto the free and absolute control and disposal of his or her separate property or estate; and

"Whereas it is the intention of the intended wife to waive, relinquish and bar all her inchoate intestate and other rights or interests, either as wife or widow of the First Party, in and to any property now owned or hereafter acquired by the First Party, *including her right of election to take against the Will of the First Party*;* and . . .

"Whereas, the First Party, being the intended husband, is seized in fee simple of certain real property located in Quakertown Borough, Bucks County, Pennsylvania, as well as certain personal property, *the value of which has been fully disclosed to the intended wife or Second Party*; and . . .

"Now Therefore, in consideration of the said marriage and the covenants of the Second Party, the First Party agrees to pay the Second Party the sum of Ten Thousand Dollars ($10,000.00) immediately after April 1, 1965; and in consideration of the said marriage and the covenants of the First Party, the Second Party agrees to pay the First Party the sum of One Dollar ($1.00) immediately after April 1, 1965, it being the intention of the parties that this Agreement shall be binding upon themselves, their heirs, executors and administrators.

. . .

"The Second Party covenants and agrees that the *said payment shall be in lieu of any and all of her rights in and to the real and personal property of the First Party, now owned or hereafter acquired,* including all and any inchoate intestate rights, and rights as heir of any kind. She hereby releases unto the First

---

* Italics throughout, ours, unless otherwise noted.

Party, his heirs, personal representatives and assigns forever all of her interest, rights and claims in and to the said property of every nature and kind.

"This Agreement is executed *with the full realization and understanding that the separate estates of the parties are not equal in amount,* . . .

"Nothing herein contained shall prevent either of the parties hereto from voluntarily making gifts of any nature and type whatsoever to each other, or one to the other, either during their respective lifetimes or by their respective last Wills and Testaments.

"This writing contains the entire agreement between the parties and it cannot be altered, supplemented or amended by parol."

LeRoy A. Hillegass released all his rights in and to the property of his intended wife in provisions identical with those provisions for the wife hereinabove quoted.

It is difficult to conceive of a clearer or fuller or more complete release by an intended wife of all her present and future rights and interests in her intended husband's estate.

In compliance with the Antenuptial Agreement, Hillegass paid Esther the sum of $10,000 on April 15, 1965, thirteen days after they were married. Moreover, although not controlling or relevant to the issue of reasonableness or of full and fair disclosure, he gave Esther, we repeat, codicillary gifts which totaled approximately $30,000.

In spite of all the aforesaid covenants, admissions, waivers, releases, facts and codicillary gifts, Esther filed an election to take against her husband's will. The executor of the will of LeRoy A. Hillegass, joined in by several legatees, filed a petition to set aside Esther's election, and the lower Court, we repeat, granted the petition and struck off Esther's election to take against her husband's will. This Decree we affirm.

Appellant bases her contentions and her appeal upon the allegation that LeRoy did not live like a man who had $250,000 and therefore (1) in spite of the recitals of disclosure she did not know until after LeRoy's death the exact value of his estate, and the burden was upon Hillegass's Estate to prove a full and fair disclosure, and (2) even though the Agreement provided that "both parties, for themselves, their heirs, and personal representatives *hereby irrevocably waive any future assertion or defense of adequacy of consideration . . .*", the property given to her by her prospective husband in the Antenuptial Agreement was inadequate under the law.

In the field of Antenuptial Agreements, the pertinent law has been differently and varyingly expressed in a number of cases,* with the result that in several respects the law is not as clear, definite and certain as it should be. We shall therefore eliminate the confusion and conflicts resulting from different expressions of the applicable standards and principles by stating clearly and more definitely the applicable standards and principles in this field.**

Parties to an Antenuptial Agreement providing for the disposition of their respective estates do not deal at arm's length, but stand in a relation of mutual confidence and trust that calls for the highest degree of good faith and a reasonable provision for the surviving spouse, *or* in the absence of such a provision a full and fair disclosure of all pertinent facts and circumstances. *Gelb Estate,* 425 Pa. 117, 123, 228 A. 2d 367;

---

* All of which we have reviewed and carefully considered.

** We have carefully examined and reviewed the facts and the law stated in each and all of the prior cases, and any statement of law or of the appropriate test standards or principles in any of them which is contrary to or modifies or changes the hereinafter stated standards or tests or principles are hereby disapproved and nullified.

*Kaufmann Estate,* 404 Pa. 131, 136, 171 A. 2d 48; *Mc-Clellan Estate,* 365 Pa. 401, 407, 75 A. 2d 595; *Whitmer's Estate,* 224 Pa. 413, 73 A. 551.

However, it is too often forgotten that one of the two principal purposes of an Antenuptial Agreement is to change the provisions which the statutory law of Pennsylvania makes for a surviving spouse. *Emery Estate,* 362 Pa. 142, 147, 66 A. 2d 262.

(1) An Antenuptial Agreement is presumptively valid and binding upon the parties thereto.

(2) *The person seeking to nullify* or avoid or circumvent the Agreement has the burden of proving the invalidity of the Agreement by clear and convincing evidence that the deceased spouse at the time of the Agreement made *neither* (a) *a reasonable provision for the intended spouse, nor* (b) *a full and fair disclosure* of his (or her) worth. *Gelb Estate,* 425 Pa., supra, page 123; *Kaufmann Estate,* 404 Pa., supra, page 136; *McClellan Estate,* 365 Pa., supra, page 407; *Emery Estate,* 362 Pa., supra, pages 142, 146; *Snyder Estate,* 375 Pa. 185, 188, 100 A. 2d 67.

(3) In evaluating the reasonableness of the provision for the survivor, such reasonableness must be determined *as of the time of the Agreement* and not by hindsight. *Gelb Estate,* 425 Pa., supra, page 123; *Kaufmann Estate,* 404 Pa., supra, page 137. *Reasonableness* will depend upon the totality of all the facts and circumstances *at the time of the Agreement,* including (a) the financial worth of the intended husband; (b) the financial status of the intended wife; (c) the age of the parties; (d) the number of children each has; (e) the intelligence of the parties; (f) whether the survivor aided in the accumulation of the wealth of the deceased spouse; and (g) the standard of living which the survivor had before marriage and could reasonably expect to have during marriage.

(4) Full and fair disclosure does not require the disclosure of the *exact* amount of his or her property: *Kaufmann Estate,* 404 Pa., supra, page 136; *Emery Estate,* 362 Pa., supra, page 146; *Holwig Estate,* 348 Pa. 71, 74, 33 A. 2d 915; *McCready's Estate,* 316 Pa. 246, 255, 175 A. 554.

(5) Even where there is a valid Antenuptial Agreement, this does not prohibit subsequent inter vivos gifts and testamentary bequests to a surviving spouse.

Appellant relies upon *Gelb Estate,* 425 Pa., supra, but that case is clearly distinguishable on its facts. In that case, Edward H. Gelb, the decedent, and his widow, each of whom had had adult children by prior marriages, entered into an Antenuptial Agreement under which Mrs. Gelb received $15,000 in cash, and each renounced his and her interest in the estate of the other. The parties lived harmoniously until the husband's death three years after marriage. Mrs. Gelb then filed an election to take against her husband's will; his executors filed a petition to vacate this election. The lower Court decided in favor of the widow and permitted her to take against her husband's will because the auditing Judge, who saw and heard the witnesses, *found* that the evidence " 'convincingly establishes' that: '(1) *the decedent materially misrepresented* to [his intended wife] *the value of his estate* at the time he induced her to execute the antenuptial agreement; (2) [the intended wife] executed the antenuptial agreement in reliance upon the representations which . . . Gelb made to her.' " This Court agreed with these findings and, based thereon, affirmed the decree.

The lower Court based its decision of misrepresentations principally upon the testimony of Harry B. Berk, Esquire, who was the scrivener of the Antenuptial Agreement. That Court correctly held that Berk's

testimony was admissible and that *Mrs. Gelb's testimony was inadmissible initially* [Accord: *Snyder Estate,* 375 Pa., supra, page 189; *Inskipt's Estate,* 324 Pa. 406, 410, 188 A. 127; *Holwig Estate,* 348 Pa., supra, page 71], but became admissible *"when the party representing the decedent* calls a witness who testifies adversely to the interests of the surviving party about a transaction which occurred in the presence of the survivor and the witness. . . . Commonwealth Trust Co. v. Szabo, 391 Pa. 272, 283-84, 138 A. 2d 85, 90; Bowman's Estate, 301 Pa. 337, 342-43, 152 Atl. 38, 40." This Court in *Gelb Estate* further pertinently said (page 123) : ". . . *When the person attacking the agreement has shown that it was made on the basis of material misrepresentations,* it will be presumed that the contract was entered in reliance upon these misrepresentations and the burden to prove otherwise is cast upon the party seeking to uphold the agreement. McClellan Estate, 365 Pa. 401, 75 A. 2d 595 (1950)."

We shall now consider the facts in the instant case in the light of the aforesaid principles.

The only relevant testimony offered by appellant (wife) was that of a former neighbor and of a former boarder, who merely testified to the deceased husband's modest way of living, including his modest dress, modest home, and modest automobile. Of course, this was insufficient to prove, as claimant must, nondisclosure of assets in contradiction of the statement of full disclosure in the Antenuptial Agreement.

In the instant case, prior to Esther's marriage to Hillegass, she had been married to a Mr. Cassel,* who had been employed as a railroad dispatcher. Cassel died in 1951 and their son was thereafter admitted to Girard College. After Cassel's death, appellant continued in her employment at John Wanamaker's,

---

* Whose first name does not appear in the record.

where she earned approximately $44 a week, and occasionally took in boarders at her home for $8 per week.

In the present case, there was no clear and convincing evidence by the wife of material misrepresentations or nondisclosure, and consequently we need not consider whether the provision for the intended wife was or was not reasonable.

Decree affirmed, appellant to pay the costs.

Mr. Justice COHEN concurs in the result.